UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 07 CR 815 |
| vs. | ) | Judge Rebecca Pallmeyer |
| | ) | |
| GARY LINDESMITH | ) | |

## DEFENDANT GARY LINDESMITH'S
## POSITION PAPER AS TO SENTENCING FACTORS

Defendant GARY LINDESMITH, by his attorneys, ELLIOT SAMUELS and MICHAEL D. SHER, respectfully submits the following sentencing memorandum.

### Introduction

Gary Lindesmith is a happily married father of two adult children and grandfather of one. He is an extremely active member of his community and church. Mr. Lindesmith also is the co-owner of Lindco Equipment Sales, Inc. ("Lindco"), a trucking equipment and truck-outfitting services company that he founded in February, 2001, with the proceeds of his individual retirement account. Since that date, through Mr. Lindesmith's hard work, Lindco has become a viable business which employs 15 people.

On April 7, 2008, Mr. Lindesmith pled guilty to a second superseding information, which charged him with one count of mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1346. Mr. Lindesmith has acknowledged that he, at the direction of an employee of the Village of Bolingbrook, sent false invoices to the Village for payment to Lindco to recover funds, i.e. charitable contributions and entertainment expenses, expended by Lindco at the direction of that Village official.

Mr. Lindesmith has accepted responsibility for his illegal conduct. While he, unlike all other defendant-vendors who have pled guilty to similar charges, did not personally profit from the scheme (other than in the ordinary course of Lindco's business), Mr. Lindesmith sincerely regrets having engaged in conduct he knows to be wrong and detrimental to the Village. For the reasons set forth below, it is respectfully requested that the Court sentence Mr. Lindesmith to a term of probation. Should the Court decide to impose conditions on such probation, it is respectfully requested that any such conditions permit Mr. Lindesmith to remain active in the day-to-day business of Lindco. Consistent with the mandates of 18 U.S.C. §3553(a), such a sentence would appropriately recognize the particular conduct and motives of each of the similarly situated defendants, the facts of the offense, the characteristics of the offender, and the need to impose a reasonable sentence which is sufficient, but not greater than necessary, to accomplish the sentencing and societal goals of punishment, deterrence, rehabilitation and return to productive citizenship.

**I.    The Offense Conduct**

Until 1999, Mr. Lindesmith lived and worked in the Village of Bolingbrook. Mr. Lindesmith moved to Northwest Indiana that year and started Lindco two years later in February, 2001. The Village of Bolingbrook's Building and Fleet Division was one of Lindco's customers. To obtain payment from the Village of Bolingbrook (the "Village" or "Bolingbrook") for equipment and services, Lindco submitted invoices to the Village.

In or around July, 2001, Building and Fleet Superintendent John Schwab ("Schwab") told Mr. Lindesmith that if Lindco wanted to continue its business with the Village, Mr. Lindesmith needed to speak to the Mayor of Bolingbrook, Roger Claar. As a result, Mr. Lindesmith visited

- 2 -

the mayor at his office.  Mayor Claar told Mr. Lindesmith that he did not know why the Village

should continue to do business with Lindco since Lindco was not located in Bolingbrook and Mr.

Lindesmith was no longer involved in the community.  Mr. Lindesmith was dismayed by the

mayor's remarks and was concerned that his fledgling business would fail without the Village's

continued business.  As he was leaving Mayor Claar's office, Mr. Lindesmith received a

telephone call from Mr. Schwab.  Mr. Lindesmith related the details of his conversation with the

mayor to Schwab, who suggested that Mr. Lindesmith should make political and charitable

contributions to and/or as directed by Bolingbrook officials, including Mayor Claar, in order to

maintain Lindco's business with the Village.  Schwab stated that Mr. Lindesmith could recoup

any such payments from the Village by submitting inflated or false Lindco invoices to the

Village (the payment of which would be approved by Schwab).

From approximately July, 2001, through December, 2005, at the request of Schwab,

Mr. Lindesmith made a series of contributions, through Lindco, to Mayor Claar's political

campaigns and charities favored by Mayor Claar's daughter, which totaled approximately

$12,775.  Lindco recouped these contributions by submitting to the Village fraudulent invoices

that charged for items that never were sold or inflated prices for certain items that were

purchased by the Village.

During the same period, Mr. Lindesmith also provided Schwab with meals and

entertainment for which Lindco expended approximately $7,500.  Once again, Mr. Lindesmith,

through Lindco, recouped these expenses by submitting invoices to the Village, which charged

for goods which were neither ordered nor delivered or which overcharged for goods which were

purchased from Lindco.

- 3 -

As a result of Mr. Lindesmith's participation in Schwab's scheme, Lindco received improper payments from the Village in the approximate amount of $20,275. Mr. Lindesmith and Lindco recouped these payments from the Village.  When he entered his guilty plea, Mr. Lindesmith tendered his personal check in the amount of $20,275 in full satisfaction of the agreed restitution amount.

Unbeknownst to Mr. Lindesmith, he was not the only vendor to the Village involved by Schwab in his scheme.[1]  Unlike the Village officials and the other vendors who schemed with Schwab, neither Lindco nor Mr. Lindesmith netted or retained any unearned funds as a result of the scheme – $20,275 in contributions and entertainment expenses actually paid by Lindco were recouped, dollar for dollar.  Unlike the other vendors, Mr. Lindesmith did not invoice or retain any "premium" payments for himself which were in addition to the recouped payments.  Finally, unlike any of the others, Mr. Lindesmith terminated his participation in Schwab's scheme in December, 2005, of his own accord.

## II.    Gary Lindesmith's Personal and Professional Background and Character

Gary Lindesmith is a family man, a business owner and a dedicated and active member of his community and his church.

### A.    Gary Lindesmith is Dedicated to his Family

In the words of Rachel Lindesmith, Mr. Lindesmith's 26-year-old daughter, her father "always puts his family first." (R. Lindesmith Letter, May 2, 2008, Tab 1.) Mr. Lindesmith has been married to his high-school sweetheart, Noreen E. Lindesmith, for over 30 years. Gary and

---

[1]    While the PSR accurately summarizes the allegations of the Second Superseding Information – charging that Mr. Lindesmith was involved in a single scheme with Schwab, Ralls and all of the other vendors – Mr. Lindesmith's plea agreement makes clear that he was not part of a single comprehensive scheme involving Village officials and all of the vendors.

Noreen currently live in Lowell, Indiana. They have two adult children, Rachel Lindesmith and Daryl Lindesmith (30 years old). Rachel Lindesmith lives in Crown Point, Indiana and is engaged to be married to Phillip Quiroz. Daryl Lindesmith, his wife Nanette and their three-year-old daughter Brooke also live in Crown Point. Daryl and Nanette are expecting a baby boy in July. Gary Lindesmith is actively involved in the lives of his wife, his children and their significant others. Attached to this submission at Tab 1 are letters written by Noreen, Daryl, Nanette, Rachel and Mr. Quiroz, which describe Mr. Lindesmith's substantial role in their lives.

### B.    Gary Lindesmith is a Hard-working Business Owner

After many years working for others in trucking equipment sales, in February, 2001, Mr. Lindesmith founded Lindco to provide a better life for his family. Mr. Lindesmith's investment in Lindco has been significant. In the words of his long-time accountant Karen McMahon, "Mr. Lindesmith began his business venture by cashing in his retirement account and investing the funds as well as his personal energies into providing quality services for local municipalities and jobs for several individuals." (McMahon Letter, May 9, 2008, Tab 2.) With his life savings invested and his family's future on the line, Mr. Lindesmith tirelessly has worked to develop Lindco into the business it is today – a business which employs 15, including Mr. Lindesmith's two children (Daryl as Regional Sales Manager and Rachel as Parts Manager) and his wife (President).

Ms. McMahon, who has been an accountant for Mr. Lindesmith and Lindco for over eight years, views Gary as an "honest businessman." (McMahon Letter, May 9, 2008, Tab 2.) She is not alone in this judgment. Indeed, it is shared by most everyone who works with

Mr. Lindesmith.[2]  As the Court will see from the letters attached to this submission, those who have dealings with Mr. Lindesmith on a professional basis also consistently praise his work ethic and professionalism.[3]  Many people – suppliers, vendors, customers (both public and private) and employees – depend upon Mr. Lindesmith and the services provided by Lindco, and intend to continue doing business with or working for him in the future.[4]

### C.    Gary Lindesmith is Committed to Serving his Community and his Church

In addition to his commitment to his business and professional life, Mr. Lindesmith has demonstrated remarkable devotion to his community over the years.  From his interest in

---

[2]  A sampling of similar sentiments expressed in the letters attached at Tab 2 are as follows: "The reason I chose to come to work at Lindco was because of Gary's honest and open approach to things." (Paul Dieck, Shop Operations Manager, Lindco); "I respected the way Gary was honest with me." (Mike Berwanger, Sales Representative, Lindco); "I can confirm that Gary is a man of great integrity…Because of his values and honesty, our business relationship turned into a personal friendship, which I truly cherish."  (James Sohacki, President, KLR Property Management, Inc.); "In my experience Gary Lindesmith is a very honest and trustworthy person…." (Stephen Rider, Vice President, Viking-Cives Midwest, Inc.); "…I believe Gary approaches clients in the same manner I do, with honesty and integrity…." (Kevin T. Smith, Vice President of Sales and Marketing, Certified Power Inc.); "…I have found Gary to be a very decent and honest person in all of my dealings with him over the years." (John Schnadenberg, Street Commissioner, Town of Chesterton, Indiana); "Gary is an honest, decent man…." (Ron Coffman, General Sales Manager).

[3]  A sampling of similar sentiments expressed in the letters attached at Tab 2 are as follows: "I have always been impressed with Gary's work ethic, professionalism, and trustworthiness." (Stephen H. Rider, Vice President and General Manager, Viking-Clives, Midwest); "Gary has worked hard over the past 6 years of so to build a reputable business in the truck equipment industry.  His customers know that they will be treated fairly and that Gary will work hard on their behalf to meet their needs." (Lonnie Yingst); "[Gary] has worked hard all his life to become a successful businessman…." (David W. Burgess, Branch Manager, Chicago International Trucks); "I can only hope others at this difficult time can see Gary as I have for years, as an honest hard working man who is deeply committed to his family and has been involved in his community wherever he has lived." (Richard J. Domonkos, Training Specialist, Purdue University).

[4]  "With many years in the business world if I have the opportunity to do more business with Gary I would not hesitate!" (Robin Bradley, Treasurer, BASE Federal Credit Union); "I will continue to do business with Gary and his company no matter the outcome of his case."  (Ron Coffman, General Sales Manager). (Tab 2).

coaching his children in their sports activities grew Mr. Lindesmith's passion for coaching youth sports. As the Community Involvement Resume attached at Tab 3 details, from 1980 through 2006, Mr. Lindesmith was the head coach of various local Pop Warner Little Scholars[5] football teams, little-league teams and tee-ball teams.

Mr. Lindesmith's involvement in Pop Warner football has gone far beyond coaching – he was the co-founder and President of the North Newton Pop Warner team and the President and head coach of the Bolingbrook Trojan Pop Warner team. In 1988, Mr. Lindesmith personally guaranteed a loan of $150,000 for improvements to the Bolingbrook football complex, and in 1991, he personally guaranteed a second loan of $210,000 for additional improvements to the football complex. Mr. Lindesmith's commitment of time and energy to Pop Warner football teams in his community and his willingness to financially back necessary improvements to the football complex paid off for his young players and the community. Mr. Lindesmith's Pop Warner teams won National Championships in 1994 and 1996 and were runners-up in 1988, 1990 and 1997, earning them national recognition on ESPN and CBS. In 1998, Mid-America Pop Warner Little Scholars named Mr. Lindesmith Male Volunteer of the Year in recognition of his role as Vice Regional Director of the Mid-America Region.[6]

---

[5] Pop Warner Little Scholars, Inc. (PWLS) is a non-profit organization that provides youth football and cheer and dance programs for participants in 41 states and several countries around the world. Consisting of approximately 360,000 young people ranging from ages 5 to 16, PWLS is the largest youth football, cheer and dance program in the United States. Pop Warner Little Scholars, Inc. Home Page, http://www.popwarner.com.

[6] Color copies of photos of Mr. Lindesmith's many awards in connection with his involvement in Pop Warner football are attached to this submission at Tab 4. Due to their size in megabytes, these copies will be provided to the Court and the government in hard copy only.

The former president of the largest Pop Warner conference in Illinois, Mr. Richard M. Baczak, has this to say about Mr. Lindesmith:

> Having met Gary over 25 years ago, I have always known him to be a person of honor and high standards. We met due to our involvement with Pop Warner Little Scholars. I was president of the largest conference in the State of Illinois and later with Gary's help merged the other Conference into ours. I was visibly impressed with his leadership, discipline and honesty. He was not only a very good administrator but a coach who was admired by his peers and loved by his players. Gary was elected Vice-president of the Conference and when I retired after 14 years I recommended Gary run for President. He won and continued to lead the 35 cities and towns with dignity and fresh new ideas. His thoughts always were for the children.

(Baczak Letter, dated April 25, 2008, Tab 5.) The former head football coach at Bolingbrook High School, Phil Acton, who has known Mr. Lindesmith for over 20 years, echoes these sentiments: "I have always known Gary to be an honest, hard-working, responsible individual who takes a great deal of pride in his work and is always willing to help others." (Acton Letter, dated April 24, 2008, Tab 5.) Mr. Lindesmith's service of almost 30 years to the youth of his community is a reflection of his exemplary character and proof of his life-long commitment to helping others.

In addition to his professional and youth-sports activities, since 2003, Mr. Lindesmith has been extremely active at Bethel Church in Crown Point, Indiana. Reverend Steven DeWitt, Senior Pastor of Bethel Church, describes Mr. Lindesmith as being "very active" in the church's ministries. (DeWitt Letter, dated April 30, 2008, Tab 6.) Kenneth A. Moss, a fellow member of Bethel Church, recognizes Mr. Lindesmith's honest character, integrity and professionalism in connection with his role in the church's counting ministry, which confers on Mr. Lindesmith responsibility for "handling, counting, and depositing the money collections for very sizable church donations averaging $50,000." (Moss Letter, dated April 29, 2008, Tab 6.) Galen

Christoper Carr, the Pastor of Administration at Bethel Church, has this to say about Mr. Lindesmith: "Gary has become a vital member of our church body and I expect his contribution to continue to increase in the days ahead. I strongly endorse his character...." (Carr Letter, dated May 3, 2008, Tab 6.)

Mr. Lindesmith's dedication to family, work, community and church shows his true colors and highlights the aberrational nature of the conduct at issue in this case.

**III.    Maximum Statutory Penalties**

Using the November 2007 Sentencing Guidelines, the PSR suggests that Mr. Lindesmith's Guidelines offense level comes to level 20,[7] less 3 points for acceptance of responsibility under §3E1.1(a) and (b). (PSR, p.13.). When combined with a criminal history category of I, the offense level of 17 results in an advisory Guidelines range of 24 to 30 months of imprisonment, in addition to any supervised release or fine the Court may impose.[8] Under 18 U.S.C. §3561, Mr. Lindesmith is eligible for a sentence of probation.

**IV.    Imposition of a Sentence Below That Suggested by the Guidelines Is Warranted Under the Facts**

This Court already has imposed sentence on two of the vendors involved in Schwab's schemes, Murteza Gazaferi and Ahmet Rusid. Although both vendors' plea agreements reflected a Guidelines calculation resulting in an offense level of 17 and an anticipated Guidelines range

---

[7]    Base level of **12** (§2C1.1(a)(2)); increase of **4** levels for loss more than $10,000, less than $30,000 (§2C1.1(b)(2) and §2B1.1(b)(1)(C)); increase of **4** levels for offense involving public official in high-level decision-making position (§2C1.1(b)(3)).   Mr. Lindesmith does not dispute this guideline calculation, but, for the reasons that follow, does dispute that the resulting guideline range should determine his sentence.

[8]    Mr. Lindesmith has already paid the $20,275 in restitution which he agreed to pay in his plea agreement.

of 24-30 months in custody – the same offense level and Guidelines range suggested by Mr. Lindesmith's PSR – both defendants were sentenced to a three-year term of probation with conditions of confinement and community service.  Mr. Lindesmith respectfully suggests that since he made no personal profit from his participation in Schwab's scheme (nor sought any such personal gain), that fact should be accounted for in mitigation of his sentence and that, therefore, it would be appropriate to impose on him a sentence lesser than that imposed on Gazaferi and Rusid.

A.     *United States v. Booker* **and** *Gall v. United States* **Support the Imposition of a Sentence of Probation with Appropriate Conditions**

The ultimate goal of sentencing is to impose a sentence "sufficient, but not greater than necessary" to reflect the seriousness of the offense, deter future criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with any necessary correctional treatment.  18 U.S.C. §3553(a).  A rote application of the Guidelines is not an appropriate means to determine such a sentence in the post-Booker world.  *United States v. Booker*, 125 S.Ct. 738 (2005).  Rather, the Sentencing Guidelines should be only the starting point of the analysis.  *Gall v. United States*, 128 S.Ct. 586, 596 (2007).  After calculating the applicable Guidelines range, the sentencing court should consider the sentence requested by a party and then determine whether the requested sentence is supported by the factors articulated in 18 U.S.C. §3553(a).  *Id.*  Because the Guidelines are no longer mandatory, the "'range of choice [in sentencing] dictated by the facts of the case' is significantly broadened," and a judge is open to "consider sentences other than imprisonment." *Gall*, 128 S. Ct. at 602. As was recognized by the lower court in *Gall,* a sentence of probation is not an "act of leniency" – rather, it is a

"substantial restriction of freedom." *Gall*, 128 S.Ct. 586 at 593. "Offenders on probation are ... subject to several standard conditions that substantially restrict their liberty." *Id.* at 596.

**B.    The Loss Calculation is Hugely Disproportionate to Mr. Lindesmith's Minimal "Gain"**

The significant disparity between the loss calculation (more than $10,000, less than $30,000) and Mr. Lindesmith's "gain" as a result of his participation in Schwab's scheme justifies a sentence which is less than that suggested by the Guidelines. *See United States v. Forchete*, 220 F.Supp.2d 914, 925 (E.D. Wis. 2002) (downward departure may be appropriate where "the defendant's fraud may have been for little or no gain, especially in comparison to the size of the loss"); *United States v. Costello*, 16 F.Supp.2d 36, 39 (D. Mass. 1998) (granting departure based on the extent of disproportion between the loss amount and the gain to the defendant in a theft case, finding that "[t]he 'heartland'...resides in a case where loss and gain are roughly coincident").

Here, as stated above, Mr. Lindesmith retained no unearned funds as a result of his participation in Schwab's scheme. Mr. Lindesmith terminated his involvement in the scheme in December, 2005, before he had any knowledge of the government's investigation. Mr. Lindesmith did not mark up the charges imposed to recoup payments made at Schwab's direction; he did not inflate Lindco invoices to personally profit from the sale of goods and services to the Village of Bolingbrook. He complied with Schwab's directions so that Lindco could continue its business with the Village, recouping only the amounts spent at Schwab's direction. Mr. Lindesmith recouped the funds paid as political and charitable donations and entertainment expenses, dollar for dollar, keeping no premium for himself (unlike those involved

- 11 -

with Schwab in related schemes).  Because Mr. Lindesmith's "gain" from his conduct is not

congruent with the Village's loss of $20,275, a sentence below the Guidelines is warranted.

### C.    Mr. Lindesmith's Culpability Is Significantly Less than that of Others Involved in the Other Schemes

Because, unlike all others involved in Schwab's schemes, Mr. Lindesmith sought only to

recoup funds expended at the direction of Schwab, did not mark up charges to recoup such funds,

and did not seek to profit from the scheme (other than as a result of maintaining his regular

business with the Village), Mr. Lindesmith's conduct is unlike that of any other individual

involved in any of the related schemes.  According to their plea agreements and admissions to

this Court, all of the other participants charged and retained a premium − in addition to the

expenses to be recouped − as a result of their participation in the schemes.  Specifically, each of

the other participants retained the following benefits:  Donald Ralls, Village official, received

free merchandise and services for himself valued at $6,781; John Schwab, Village official,

received free merchandise and services for himself valued at $451,000; David Donaldson,

vendor to the Village, charged and retained $99,000 in cash payments for goods and services

which were never provided to the Village, in excess of funds recouped; Murteza Gazaferi and

Ahmet Rusid, vendors to the Village, charged and retained $24,000 in cash payments for goods

and services which were never provided to the Village, in excess of funds recouped; and Alan

Guzzino, vendor to the Village, charged and retained $55,000 in cash payments for goods and

services which were never provided to the Village, in excess of funds recouped.

Unlike any of the other participants, Mr. Lindesmith did not gain from his participation in

Schwab's scheme, nor did he attempt to do so.  Accordingly, he deserves, at the very least, a

sentence not greater than the lowest sentence imposed on any other participant.  To date,

sentence has been imposed on the two Village officials involved, John Schwab (thirty-five months of imprisonment, followed by two years of supervised release) and Donald Ralls (two years of probation). Two of the five vendors involved, Gazaferi and Rusid, also have been sentenced.[9] Both vendors' plea agreements suggested an offense level of 17 and an anticipated Guidelines range of 24-30 months – that is, the same offense level and anticipated Guidelines range suggested by Mr. Lindesmith's PSR. Both Gazaferi and Rusid were sentenced to a term of probation of three years (the first six months to be served in community confinement, followed by six months of home detention) and 300 hours of community service. Since Mr. Lindesmith did not personally profit from Schwab's scheme in the same manner as did Gazaferi and Rusid (nor did he attempt to do so), there is a rational and just basis for imposing a lesser sentence upon Mr. Lindesmith than those received by Gazaferi and Rusid. Therefore, a sentence of probation without any conditions which would result in Mr. Lindesmith's confinement is appropriate.

A sentence of probation without conditions of confinement would be a reasonable and just one because it would appropriately punish Mr. Lindesmith, while at the same time taking into account his relatively minor role in Schwab's scheme, the fact that he did not seek to earn a premium from his participation in the scheme and did not receive any such premium, his lack of previous criminal activity, his genuine remorse for his conduct, and his contributions to his community and business. Such a sentence is both severe and fully sufficient to accomplish the goals of sentencing given the nature and circumstances of the offense and Mr. Lindesmith's history and personal characteristics detailed above. Moreover, such a sentence of probation

---

[9] The remaining vendors, Donaldson and Guzzino, are scheduled to be sentenced on July 11, 2008, the same day on which Mr. Lindesmith is to be sentenced.

would recognize the distinction between Mr. Lindesmith's conduct and that of others involved in similar schemes. Finally, the requested sentence would allow Mr. Lindesmith to continue to build his business, providing necessary services to Lindco's many customers and preserving the jobs of Lindco's employees, and to continue his demonstrated commitment to service to his community and church.[10]

### Conclusion

Under *Booker* and *Gall*, the Court is no longer bound to follow the Sentencing Guidelines and has discretion to impose the requested sentence of probation. It is respectfully suggested that such a sentence would restrict Mr. Lindesmith's liberty in a way which sufficiently recognizes the gravity of the offense to which he has admitted guilt and would be consistent with the range of sentences imposed on other participants, but at the same time would permit him to remain a productive and devoted member of his community and builder of his family business.

Respectfully submitted,

GARY LINDESMITH

By:  ___/s/___Michael D. Sher_____
One of his attorneys

Elliot Samuels (#2449714)
30 S. Wacker Drive, Suite 2300
Chicago, Illinois 60606

Michael D. Sher (#2580519)
Neal, Gerber & Eisenberg LLP
Two North LaSalle Street, Suite 2300
Chicago, Illinois 60602

---

[10] If this Court imposes a sentence of probation with any conditions of confinement, it is requested that such conditions allow Mr. Lindesmith to operate his business and to attend his church and participate in church affairs.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing **Defendant Gary Lindesmith's Position Paper As To Sentencing Factors** has been electronically filed via this Court's ECF system on July 3, 2008, which system will cause service via electronic mail upon

    Steven A. Block *(steven.block@usdoj.gov)*
    Assistant United States Attorney
    219 S. Dearborn St., Fifth Floor
    Chicago, IL 60604

                              /s/    Michael D. Sher